(Sitting in Hancock circuit by special assignment.)

\*CONNECTICUT FIRE INS. CO. v. T. & W. R. CARNAHAN.

**1. RULE AS TO SETTING ASIDE VERDICTS.**

The verdict of a jury should not be set aside by the court to which it is returned, on account of any mere difference of opinion between the judge and the jury, as to the weight of the testimony, but only when the verdict is unsupported by or is against the decided weight of the evidence; and should not be disturbed by a reviewing court, unless so clearly unsupported by the weight of the evidence as to indicate some misapprehension or mistake or bias on the part of the jury, or a wilful disregard of duty.

**2. RULE APPLIED TO ACTION ON POLICY OF INSURANCE.**

A verdict for plaintiff in an action against insurance companies, in which the evidence in support of the defense that the fire was incendiary, and caused by assured, was of a circumstantial nature, and vague and indefinite, and, as to circumstances, improbable, and where circumstances surrounding witnesses for the insurance companies strongly suggested undue influence or corruption, and the whole matter was involved in contradiction, should not be disturbed by a reviewing court.

**3. EVIDENCE OF WITNESSES DISCREDITED BY THEIR OWN CONDUCT.**

The jury was justified in wholly disregarding, if they did so, the testimony of a witness who, previous to the trial, made conflicting statements, for and against assured, and who was pursued by the insurance companies and finally turned out a witness in their behalf. And also in disregarding the evidence of a witness who, for several years after the fire, failed to disclose evidence in his possession unfavorable to assured, and who then became a witness for the insurance companies.

**4. CONDUCT OF ASSURED IN OBTAINING STATEMENTS OF WITNESSES—OFFER OF MONEY.**

The fact that assured, knowing that the statements of a fellow townsman were unfavorable, and tending to support the claim that assured was guilty of burning his own property, appealed to such person, who afterwards became a witness, to make a statement denying such statements, and even going so far as to offer small sums of money to have him do so, is not necessarily reprehensible or tending to prove guilt. The credibility of the assured and the witness, under such circumstances, is a fair question for the jury.

**5. CONDUCT OF ASSURED IN SUCH MATTERS NOT PROOF OF GUILT.**

The same rule is applicable to the fact that assured, knowing of the unfavorable reports and having a large sum of money at stake, showed great interest and anxiety in getting statements from the witnesses favorable to himself, and sought to have these statements reduced to writing, and sought to change or correct the reported unfavorable statements, even going to the extent of offering small sums of money or doing inexplicable things in relation thereto. The court is not authorized by such conduct to infer guilt, particularly where the evidence indicates that methods employed by the insurance companies were equally or even more questionable. It remains fairly within the province of the jury to determine the facts, and their finding, under such circumstances. should not be disturbed by a reviewing court.

---

\*For another decision involving questions arising under policies issued to these parties, see Pennsylvania Ins. Co. v. Carnahan, *post*, 000.

**6. REBUTTAL OF PROOF TENDING TO SHOW INCENDIARISM.**

Evidence that, after the fire, coal oil in considerable quantities was found to have been scattered about the store and on the goods, is not sufficient to warrant reversal, where such evidence, as to quantity of oil, etc., is more or less conflicting, and the effect of such testimony is more or less rebutted by evidence showing that lamps were used in the store, and that the lamps and other furniture were broken, and the oil scattered about, by the force of streams of water which were thrown while the fire was in progress.

**7. REVIEWING COURT MAY CONSIDER VERDICTS AND JUDGMENTS IN OTHER CASES.**

A reviewing court is not required to ignore the result of several cases, involving substantially the same evidence concerning the origin of the fire, which have been submitted to juries and reviewed by common pleas and appellate courts, but may consider such verdicts or judgments, in determining whether the jury, in the case under consideration, has gone contrary to the evidence or not.

**8. DEMAND FOR APPRAISEMENT NOT MADE IN GOOD FAITH.**

A demand for appraisement, on May 28, 1894, of goods destroyed by fire April 8, 1894, and after the insurance companies had entered into an agreement, and appointed a committee of adjusters to act for all, which committee, about April 13, notified assured that, in their opinion, he had burned the property and that the companies would so insist in defense to actions on the policies, which demand was not accompanied by an offer or proposition of any kind on the part of the insurance company making it, is not in good faith and is insufficient to establish a defense that an appraisement should have been made, under conditions of the policy, before suit was brought.

**9. NO APPRAISEMENT REQUIRED FOR GOODS TOTALLY DESTROYED.**

For goods which were totally destroyed by fire no appraisement can be demanded or required, for the reason that to appraise the loss on such goods would require appraisers to call witnesses.

KING, J.

These several cases involve many different questions; and we have divided the work of announcing the decision of the court in these five cases so that on some of the questions I will announce the opinion, and some of them Judge Marvin.

This opinion, I take the liberty to entitle the Connecticut Fire Insurance Co. v. T. & W. R. Carnahan. This case was submitted to this court, with four others; the records in each are very long, and many questions are made in them; some of them are common to all the cases, and others peculiar to only one. Many of the questions, made on the introduction of evidence, we can not notice for want of time, and so far as they not noticed, it may be understood that they have been considered, and are not found well taken.

It is my province to express the opinion of the court upon two points. One, whether the verdict and judgment are supported by the weight of the evidence, or rather, whether they are against the weight of the evidence on the question whether the fire, which destroyed the goods in question, and upon which this insurance was had, was started by the act or procurement of the plaintiffs below, or whether the plaintiffs below negligently or wilfully allowed inflammable material to be placed in their store, in such situation that it might catch on fire, thereby rendering the contract of insurance void, on account of their fraud, or negligence amounting to fraud. And the second question is whether, in the case of the Phoenix Insurance Company, certain evidence was admitted improperly, to show a waiver by that company of the right to demand an appraisement of the goods before suit was brought.

The first of these questions involves a consideration of much evi-

.dence. That part of the bill of exceptions, in this case, bearing upon the question of the origin of the fire, covers sixteen hundred pages of type-written matter, and embraces a wide field. It would be useless for me to attempt to go over this in detail and perhaps unnecessary to go over it at all; however, I will notice briefly some of the points in this evidence.

The fire occurred April 8, 1894. The Carnahans, at that time, had been in business many years, in the city of Findlay, and were the owners of a stock of goods situated in their own store, a three-story brick and stone building. The amount of goods belonging to them in this store and building is in dispute, with the other questions in the case. But the inventory taken in January, 1894, by the clerks of this firm, and testified to on the trial as correct, shows over $80,000 worth of goods were at that time in the store. The Carnahans had many investments outside of that particular business, some of which had not prospered, and they were indebted in a large sum of money, and nearly all their property, individual and common, was mortgaged, probably for all it was worth at that time, excepting the stock of goods in this store, which then had no mortgages or liens upon it.

They were indebted, however, in quite a considerable sum of money, on accounts, for goods purchased, that were in the store. One of the partners, Theophilus Carnahan, went to New York shortly before this fire, to purchase additional goods, for the spring and summer trade, and did purchase and ship some, and was engaged at the time of the fire in buying other goods. The business was virtually superintended by W. R. Carnahan, but was conducted by numerous clerks employed by the firm. This heavy indebtedness of the firm, and its actual, if not apparent, insolvency, is a fact that is alleged here as indicating a motive for burning this stock of goods. Other evidence, bearing upon the origin of the fire, from the stand-point of the insurance companies, may be separated into four kinds:

First, the evidence tending to show, as claimed, the accumulation of coal oil in this store, previous to the fire. This amounts to a showing, that about twenty gallons of coal oil were actually taken to the store, within two months preceding the fire. Omitting from this, the statement of one witness, that he took a barrel of coal oil, no other use for coal oil in the store is shown except that it was used to fill lamps, that were used in lighting the store whenever the electric lights failed to work. There is a clause in the policy prohibiting the storage of more than five barrels of petroleum or coal oil, at any one time in the store, for commerce or use, so that that clause in the policy is not shown by the evidnce to have been violated. But, it is argued that the evidence goes farther and shows that the accumulation of coal oil was more than was usual and necessary, for the purpose designed, and was intended for the purpose of firing and destroying the store. On this point, it may be said, the evidence further discloses that there were in use a number of lamps, at that time, from three to twelve; one or two of the witnesses saying three, others putting it half a dozen, still others, eight or ten, and others a dozen. These lamps were not used often, but were kept filled and ready for use, and were in that condition at or before the fire. There was found in the store, after the fire, a gallon coal oil can, filled with coal oil. The evidence as to the bringing of coal oil into the store is indefinite and vague, and little if any, reliance can be placed upon it. Two or three men, previously employed by the street railway company, in which the

Carnahans were interested, and of which one of them was president, testified that they filled and brought down on their respective cars, on different occasions, five gallon cans full of coal oil, by direction of Carnahans, and left them at the store. The effect of this statement is impaired, somewhat, by the fact that these men, or some of them, had made statements denying this, at different times. Still, at least a part of this coal oil, so claimed to have been brought, their evidence, or the evidence of W. R. Carnahan, tends to show was for the use of the partners individually, and was afterwards, and before the fire, taken to their respective homes. No such cans, or amount of coal oil in cans, or receptacles, was found in the store after the fire. Another witness testified to bringing a barrel of coal oil into the store, before the fire. He, like the others, seems to have made different statements, and he wrote and signed and swore to one, saying that he did not bring a barrel of coal oil into the store, or a coal oil barrel, nor any amount of coal oil at any time. This evidence of the car drivers and teamsters is corroborated by a witness named Clyde Cook, who had been employed by the Carnahans in the store at general work. He testifies or corroborates the drivers, as to bringing in the cans of coal oil and he testifies to seeing a barrel of coal oil at the store, a short time before the fire, but with all of his knowledge as to the situation, he does not know what became of any of this coal oil. But Cook, also, made different statements, and signed and swore to one story in the first instance. Afterwards, the evidence seems to indicate, he was faithfully pursued by the agents of the insurance companies, under circumstances that are, to say the least, exceedingly suspicious, and would imply he was being corrupted by them. Finally, he turns up as a witness in their behalf. It is useless to follow his crooked course and undertake to unravel and find out which part of the many different stories he told, is true. We conclude that the jury, if they did so, were justified in throwing out his evidence entirely, and the testimony upon that feature of the case, whether coal oil was brought into the store, previous to the fire, is exceedingly hazy. We are unable to tell who is lying about it, or when he is lying.

Another class of the evidence, devoted to implicating Carnahan, is his presence at the store, or in its neighborhood, about the time of the fire. The evidence is uncontradicted, that he was there on Saturday evening. The fire broke out about five o'clock Sunday morning. Carnahan swears he was at the store until nearly 12 o'clock; other witnesses testify as to seeing him there, under circumstances that would not seem to admit his denying it. However, he does not deny that. He says it was his habit to work there in the evening, and especially on Saturday evening, in looking over the books and doing whatever had to be done. That he did work there Saturday night, and that he closed up everything about that store securely, and, as he supposed, safely, and went home and went to bed. That he was awakened in the morning by the ringing of the doorbell and on going to his front door, he found a young man who told him there was a fire at his store. As I have said, Theophilus Carnahan, the other member of the firm, was at New York at the time, and knew nothing about these circumstances. Since the trial of this case, he has died, so he was not present to testify in these cases. Two other witnesses claim to have seen Carnahan that morning, in an alley, going southerly, in the direction of his home, and coming from the direction of the store, and about the time or just before an alarm of fire was given. That alley is 200 or 300 feet from and parallel to Main street, upon which

the store is located. Their recognition of him is pretty indistinct, and their description of his appearance and dress does not agree at all. Mr. Hirshéy, who testifies to recognizing him, finally testifies that he will not swear that it was Mr. Carnahan at all. Mr. Baker is much more positive, and is not shaken much on cross-examination. However, Baker has known Carnahan for years, and Carnahan passed him within a few feet, coming down the walk toward him for some distance, passing by and going on beyond. It was daylight; he says that Carnahan did not glance up or look at him, and neither of them spoke. A very improbable circumstance; even if it could be conceded that Carnahan was going from the store that he had set on fire, to his own house. This witness, with other people of the town, was at the scene of the fire somewhat later that day. He was around and mingled with the inhabitants and heard the excitement attending this fire, and the subsequent talk about it. Notwithstanding this, he does not seem to have disclosed this important item of knowledge until some years later., Many of the cases were tried before he saw fit to come forward and tell what he knew about it.

Another witness is introduced upon this subject, one Shafer, who testifies to what looks like a very probable story. That, starting out very early in the morning to ride his wheel, he met a man running in the direction of Carnahan's home, who told him the store was on fire; he was exhausted and asked him to go and notify Carnahan. Shafer turned his wheel in that direction and rode to Carnahan's residence, four or five blocks distant, as fast as he could. When near the Carnahan home, he saw a man crossing the street in front of him, and going into an alley running along the Carnahan premises, whom he recognized, or thought he recognized, as Carnahan, swore it was Carnahan. He called to him twice, says Carnahan looked up, but went on, and did not stop. He got off the wheel, when he reached the alley, looked up, but saw nobody, then went to the Carnahan house, and went on the porch and rung the bell. He rung it several times, before he seemed to awaken anybody, when, putting his face to the glass at the door, he saw Carnahan come in from the rear part of the house, dressed in trousers and shirt, without a hat. Whether he wore shoes, he can not say. Now, I say this looks like a very probable story as given in evidence; if no other circumstances appear to go along with it it would have great weight and would make a strong circumstance, pointing to the culpability of Carnahan; but the witness has had his career, like the others. The witness testified that Carnahan did not come down stairs, because they are situated where he could see, by looking through the front door. Carnahan testifies, as I have already said, that he was awakened by the ringing of the door bell, and that he dressed himself hurriedly and partially, and came down the front stairs. The witness Shafer has made other statements, however, contradicting this, the substance of which is, that he did not see Carnahan in the road, did not see him come from the rear of the house, but did see him come down the front stairway. The beginning of his career, along this line, does not indicate any very serious wrong doing, but it seems, gradually, and step by step, to have grown considerably worse in that respect. He was first appealed to by Mr. Carnahan, about a year after the fire, to make a statement denying that he had seen him in the road and stating that he saw him coming down the stairs, in accordance with Carnahan's claim about it. This, the young man at first refused to do. Mr. Carnahan was evidently anxious that this witness, a young man born and raised in this city, should not testify to the story that it was reported he was going to

testify to, and he appealed to him to make such a statement. This, Mr. Carnahan might have done, and still have been, and be, innocent of the fire. He even went so far, in this, according to the testimony of the young man, as to pay him small sums of money, at different times. This Carnahan himself denies. Admitting that he did, or whether he did or not, he did something that gave the young man the understanding that he was in condition of considerable anxiety about the young man's proposed testimony, and about this litigation, and that perhaps money could be had from him if he was properly worked. And the young man, soon after that, was out upon a spree in a neighboring town, and he sent for Carnahan, or rather wrote him that he wanted money. He was in Fostoria, laid up with an injury to a leg that he had recently broken. Carnahan, instead of writing or sending any word, went to see him. The young man wrote for $20.00. When Carnahan arrived, he told him he wanted $50.00. Carnahan did not have the statement, that the witness Shafer said had before been presented, but he procured writing material and told the young man to write as he should dictate. This he did, and Carnahan gave him $50.00; the young man, at the same time, saying that he would go West, away from Findlay. He started and got as far as Toledo, where he spent the $50.00 and wrote to Carnahan for $100 more, indicating in the letter that if he did not get it, he would at once consult the enemy. Carnahan does not admit that the $50.00 paid to him (Shafer) was in consideration of his making or writing the statement. He says the statement was written by the young man, and signed and delivered to him in Findlay, without any promise or offer of reward from him. But some time afterwards, he received a note from the young man that he was laid up in Fostoria and wanted help, and did not want his father to know his condition. That he went there and found him somewhat serious, and he let him have $50.00, and took his note for the amount. That when he received the note from the young man at Toledo, asking for $100, he paid no further attention to it. From the standpoint of Carnahan, and his story, his conduct, perhaps, is not reprehensible. The testimony of the young man exhibits, along with his story, that kind of conduct that would not add much weight to his evidence; we, therefore, conclude, from all this talk about the whereabouts of Carnahan, that it is so involved with contradiction that it was a fair question for the jury.

The third, and perhaps the most serious class of evidence, relates to the discovery of coal oil in the store, and upon the goods, after the fire. This was quite a serious question. Thirteen witnesses, on behalf of the company, testified to finding goods in the store soaked with coal oil, seeing coal oil on the floor, and in different parts of the store, on the stairs leading from the first to the second floor, and on the second floor. Also on a table on the second floor, and upon some account books that were piled upon this table. But other witnesses, called on behalf of Carnahan, testify to seeing coal oil on the floor, and upon the stairs, and upon the second floor to some extent; not, however, to the same extent as some of the witnesses called in behalf of the insurance company. It seems in the whole record to be conceded that there was coal oil about there. Carnahan himself testifies that the lamps, of which I have spoken, and most of which stood upon a shelf near the office, were, by the force of water from the hose, knocked off and broken, and their contents spilled. If there was a dozen of these, it is evident that a gallon or two of coal oil was distributed about the store, by the force of water, which would be a considerable amount. Carnahan accounts for coal oil on the second

floor by saying there was a lamp on the table there which was knocked off and broken, the pieces of which seemed to be found under the table. Other witnesses than Carnahan testify to this.  The store was on fire when discovered; when broken open it was filled with black smoke, and whether furiously before, certainly, as soon as the doors were opened, the air caused the flames to break out all over the store.  Several lines of water hose were run into the building, and a great deal of water was thrown into the storeroom, over the first floor.  This water hose threw a stream of an inch and a half in diameter, having a pressure at the nozzle of the hose of one hundred and twenty pounds to the square inch.  The water was kept flowing into the building for a half hour or more, and, of course, as the testimony shows, it disarranged the goods, knocked them on the floor, knocked down the shelving, broke the lamps, and knocked over everything, nearly, that was not fastened.  The first floor was literally filled with water; two holes were chopped through the floor, in different parts of the store, to let the water through into the basement, and water flowed out of the doors in streams.  A number of witnesses, agents of the insurance companies, and persons who were connected with the fire and police department, testify to finding coal oil on the goods, some in extravagant quantities, while the great bulk of the witnesses do not testify to coal oil except around the stove and near the foot of the stairway and the office, perhaps on either side of the foot of the stairway, and some on the stairs, and the spot on the first floor, where all agree that there was coal oil.

The question we are to decide, is whether we ought to reverse this judgment because it is clearly and manifestly against the weight of the evidence.  The rules which guide the courts in reviewing the facts are thus stated by the Supreme Court of Ohio, in Dean v. King, 22 Ohio St., 118, 134:

First, "The verdict of the jury should not be set aside by the court to which it is returned, on account of any mere difference of opinion between the judge and the jury, as to the weight of the testimony, but only when the verdict is unsupported by or is against the decided weight of the evidence.  5 Ohio, 245 226 ? Ed.); 12 Ohio, 151; 2 Ohio St., 44; 4 Ohio St., 566."

Second, "Motions for new trials, upon the ground that the verdict is against the weight of the evidence, are addressed to the discretion of the court, and if granted, the judgment will not be disturbed on error unless the case is so strong as to show an abuse of the discretion.  5 Ohio 245 (266 ? Ed.); 13 Ohio St., 115.  And, if the motion be overruled, a reviewing court should not reverse unless the verdict (or finding of fact, if the jury be waived) is so clearly unsupported by the weight of the evidence as to indicate some misapprehension or mistake or bias on the part of the jury, or a wilfull disregard of duty.  McGatrick v. Wasson, 4th Ohio St., 566; French v. Miller, 2 Ohio St., 53; 4 Ohio St., 50."

These must, then, be our guide.  Is this verdict so clearly unsupported by the weight of evidence as to indicate misapprehension, mistake or bias, on the part of the jury.

One other question remains and should be considered before a conclusion is reached.  It is argued that Mr. Carnahan has shown, in his own behalf, an undue interest to get statements from witnesses, favorable to himself, also denying their knowledge of certain things that they thereafter have testified to, or in affirmation of what he claims was the truth.  Motives that influence a person situated as Mr. Carnahan has

been, for five years past, are perhaps difficult to comprehend, by those not thus situated. Mr. Carnahan, from his standpoint, was seeking to have certain of these witnesses make statements in writing, favorable to his view of the case, and in many of these cases, it appeared, and in some of them it somewhat mysteriously appears, they have been found repudiating these statements made soon after the fire, and substituting an entirely different story. It would appear that Mr. Carnahan has borne, during this time, a considerable load of anxiety, and this is so whether he be guilty or innocent, and the most innocent of men sometimes do the most ridiculous things from over anxiety. It is impossible for one knowing that serious charges are made against his character, that a large amount of property has been involved in the litigation, to do otherwise than manifest extreme apprehension. Here was, according to Mr. Carnahan's statement, about $75,000 or $80,000 worth of insurance hanging in the scale; here were twenty-two insurance companies, banded together by agreement to contest these cases, and each of them, to the end. The evidence shows, that the course of the companies is to contest these cases. Five and a half years have elapsed, since the fire, and only three of them have passed into final judgment. This indicates a resolution on the part of these companies to contest each case every step of the way, and it may be reasonable to assume that they have the means at their command to make such defense and contest very vigorously. How, then, is this court to say, that because Mr. Carnahan has done some things that, to a cold blooded man, might appear inexplainable, that his guilt must be inferred from this. It can not. He has undoubtedly, to the best of his ability, sought to secure witnesses and evidence in his behalf; sought perhaps, from undue interest, to change their story, or tell one more favorable to him. All this went to the jury and was weighed by them. It will not be forgotten, however, while we are weighing up Mr. Carnahan with a critical eye— we will not forget that these witnesses, having made one statement to Mr. Carnahan, have turned around, and, by influences, certainly no higher than those that influenced Mr. Carnahan in the matter, have changed their stories, and have testified, under oath, to a different story than they have previously testified under oath. Which one of these parties has been guilty of tampering with the evidence in the case? We can not determine from this record. It may be both of them.

In thus discussing this case, I do not mean to be understood as saying there are not some suspicious circumstances, some things that are not explained as satisfactorily and clearly as we would wish, but a great many persons have had a finger in this litigation and it may not be strange it is somewhat mixed. We can not, therefore, the jury having solved the question in favor of Mr. Carnahan, conscientiously hold that we are justified in finding that they have acted under any mistake or any misapprehension or from bias, or have wilfully disregarded their duty. It is said we should close our eyes and not consider what other courts and juries have done; still that is also impossible. Eleven juries have, in this county, heard eleven cases, upon evidence similar to the evidence in this case. These have been reviewed by half a dozen able, impartial common pleas judges; some of them have passed through the circuit court, and three of them been decided by the Supreme Court. These decisions have been, all of them, one way. That fact we can not overlook, in determining the question whether this jury has gone contrary to the manifest weight of the evidence. We, therefore, conclude that the verdicts of these juries in

these cases, upon this question before us, are such that we can not disturb them.' If I have not indicated one hundred and one circumstances and facts in the case, which may have some weight, it is because the record is so voluminous that in the brief period I ought to occuyp, this can not be done.

In the Phoenix case, it is insisted that there is no evidence of a waiver of demand for appraisal or such evidence as was sought to be admitted was improperly admitted. The cases taken to the Supreme Court were contested in that court upon the questions whether the appraisement was properly demanded, and also whether it was waived, or the right to demand it waived. We have no word from the Supreme Court as to the nature of its decision, further than that it was an affirmance of the circuit and common pleas courts. See Insurance Companies (three cases v. Carnahan, 59 Ohio St., 610, 611; unreported. The ground of waiver claimed in those cases was that soon after the fire a number of adjusters met here and it was agreed two or three should act for all. These three, so acting, had several talks with the insured and his counsel. It is claimed by Carnahan, in the course of some of these conversations, that one, if not more of this committee, in substance and effect, charged that Carnahan himself had burned the stock of goods and the company should so insist, and it was argued to the jury and argued to the court that this was a waiver of the right of the company to demand appraisal of the burned goods, and upon that point the decision of the courts was in Carnahan's favor.

The Phoenix company did not, in writing, demand an appraisement until May 28, and the conversations referred to were about April 13. But it is claimed in the Phoenix case, that none of their agents were present during those conversations. It is insisted that, within the rule laid down in the 136 U. S., 242, they were entitled to an appraisement, and this evidence as to the acts of this committee was improperly admitted. We do not think the admission of any of this evidence was error. We think that the parties were entitled to have everything go in evidence to the jury. There is evidence from which it might be inferred that the Phoenix company, although not present by its agent, during the talks of the first week, still, with knowledge that certain negotiations had been had, it adopted them afterwards; it is certain that its interests were conducted and controlled by the same agents and attorneys. And this was true at the time a demand was made for an appraisement. Again, it is also questionable in this case, and a question to be considered, whether a demand for appraisement by the company was made in good faith. It is a written demand, it is true, but does not offer or propose to do anything on the part of the company. It states that without waiving any defense it has, or grounds of forfeiture, it still insists upon that provision of the policy. It may be that the company still insisted, but could they rest there. This provision of the policy is for the benefit of the company. It should have proposed to do something, whereas there is no proposition, in this demand for an appraisement, whatever. There was no refusal proven on the part of Carnahan, to have this property appraised at any time. What he might have done had the company appeared upon the scene and demanded the execution of an agreement for an appraisement, and the appointment of appraisers, as was done in the case 136 U. S., or had designated its men to act and demanded that Mr. Carnahan name his, is only a conjecture. because the parties never got that far, and we think on that ground they are not entitled to maintain

Fire Ins. Co, v. T. & W. R. Carnahan.

their defense, that there should have been an appraisement before this action was brought. And for that reason, the evidence offered in this case, even if not competent, was not prejudicial. And third, and lastly, if the evidence of Mr. Carnahan and his witnesses is to be believed, and we have already held that the judgment should .not be reversed on account of its being contrary to this evidence, then it is true that a large part of the goods contained in that store, the larger part, were entirely destroyed. His proofs of loss say there was, over $60,000 worth burned up. I confess, a reading of the evidence would not indicate that that was correct, but a reading of evidence on his part does indicate that a large part of these goods were so damaged that they could not be appraised, and I think it is well settled, where such is the fact, that the parties are not entitled to an appraisement. The contract for appraisement is not made with that in view; it is made for the purpose of appraising the loss to a damaged structure or article. And as this court has had occasion to say in Phoenix Ins. Co. v. Romeis, 8 Circ. Dec., 633, 638, these appraisers could not appraise the loss where the articles insured have been totally destroyed because that would require them to call witnesses, and become instead of appraisers, referees or arbitrators. No such contract has been made between the parties. If it had been it may be doubted whether it would be binding upon them. So that on this point in the Phoenix case we hold that the judgment should be affirmed.